**MT. HAWLEY INSURANCE COMPANY, *Plaintiff*,**

**v.**

**FEDERAL SAVINGS & LOAN INSURANCE CORPORATION, etc., et al., Defendants.**

**Ottavio A. ANGOTTI, et al., Counterclaimants,**

**v.**

**MT. HAWLEY INSURANCE COMPANY, et al., Counterdefendants.**

**No. CV 87-6 MRP.**

United States District Court, C.D. California.

Oct. 14, 1987.

R. Gaylord Smith, Lewis, D'Amato, Brisbois & Bisgaard, San Diego, Cal., for plaintiff and counterdefendant Mt. Hawley Ins. Co. and counterdefendant RLI Ins. Co.

Cheryl L. Johnson, Graham & James, Los Angeles, Cal., for defendant Federal Sav. & Loan Ins. Corp. as Receiver for Consolidated Sav. Bank; Harry W. Quillian, Gen. Counsel, Jack D. Smith, Deputy Gen. Counsel, Dorothy Nichols, Sr. Associate Gen. Counsel, James H. Lauer, Trial Atty., Federal Home Loan Bank Board, Washington, D.C., of counsel.

Jonathan B. Cole, Nemecek & Cole, Sherman Oaks, Cal., for defendants and counterclaimants Ottavio A. Angotti, Scott K. McHenry, Robert C. Hamilton, Donald J. Richardson, Jr., and Kirk P. Tanner.

Brian Lysaght, O'Neill & Lysaght, Santa Monica, Cal., for defendant and counterclaimant Robert A. Ferrante.

Ben Adelman, Pasadena, Cal., for defendant Donald P. Crivellone.

## AMENDED MEMORANDUM OF DECISION

PFAELZER, District Judge.

### I. INTRODUCTION

The motion of plaintiff Mt. Hawley Insurance Company ("Mt. Hawley") for an order confirming interpleader, and the motion of defendants and counterclaimants Ottavio A. Angotti, Scott K. McHenry, Robert C. Hamilton, Donald J. Richardson, Jr., Kirk P. Tanner and Robert A. Ferrante, joined by defendant Donald P. Crivellone,

for partial summary judgment with respect to their claims against Mt. Hawley, were heard by the Honorable Mariana R. Pfaelzer on May 4, 1987. The motion of counterdefendants Mt. Hawley and RLI Insurance Company ("RLI") to dismiss the counterclaims against them, and counterclaimants' motion for summary judgment against RLI, were heard on June 8, 1987. Having considered the oral and written arguments in support of and in opposition to these motions, and the papers and pleadings in this action, the Court has concluded that Mt. Hawley's interpleader action must be dismissed, that counterclaimants' motions for summary judgment must be denied, and that the counterclaims against Mt. Hawley and RLI must be dismissed.

## II. BACKGROUND

Plaintiff Mt. Hawley is an insurance company incorporated and having its principal place of business in Illinois. Mt. Hawley is a subsidiary of RLI, which is also incorporated and has its principal place of business in Illinois. Mt. Hawley issued a policy of directors and officers liability and company reimbursement insurance (policy number MDO 11 03 42) to defendant Consolidated Savings Bank ("CSB"), a bank incorporated and having its principal office in California. This policy was a "claims made" policy effective from May 11, 1986 to May 11, 1987. Mt. Hawley cancelled the policy on May 29, 1986, effective approximately thirty days later. The policy was a successor to a policy issued by RLI effective May 1985 to May 1986, which in turn was a renewal of a 1984–85 policy. The RLI policy had a limit of liability of $1,000,000 and an annual premium of $12,750. The Mt. Hawley policy had a limit of $500,000 and a premium of $62,500. In all other material respects, the two policies were identical. Under the terms of both policies, the costs of defense of actions against the insureds are "losses" to be charged against the policy limits.

On May 22, 1986, CSB was closed by the Federal Home Loan Bank Board ("FHLBB"). Defendant Federal Savings and Loan Insurance Corporation ("FSLIC"), an instrumentality of the United States of America, was appointed Conservator for CSB on May 22, 1986, and Receiver for CSB on August 29, 1986. On May 23, 1986, FSLIC in its capacity as receiver for CSB filed suit in this Court against, inter alia, Robert A. Ferrante, Ottavio A. Angotti, R. William Ferrante, Scott K. McHenry, Robert C. Hamilton, Raymond L. Arthun, Ronald Schmucker, Roger A. Pearson, Frank A. Rogers, Donald P. Crivellone, Donald J. Richardson, Jr., Francis X. Yrisarri, Kirk P. Tanner, Elizabeth Miller and Rolando C. Aquino ("the D & O defendants"), alleging a variety of claims including negligent and fraudulent breach of fiduciary duty, fraud and claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–68 (1982) ("RICO") ("*FSLIC v. Ferrante*" or the "FSLIC suit").

In early June, the D & O defendants tendered their defense in the FSLIC suit to Mt. Hawley by writing to RTC Underwriting Services, Inc., the agent for notification designated in the policy. In a letter dated July 9, 1986, Scott Schaffer ("Schaffer") of D'Amato & Lynch, counsel for Mt. Hawley, notified the D & O defendants that Mt. Hawley was denying coverage on the ground that the FSLIC suit fell under several policy exclusions. Mt. Hawley further reserved its right to rescind the policy "in light of the possibility of several apparent inconsistencies in the policy application," *see* Defendants' Motion for Summary Judgment, Exhibit 4. In that letter, Mt. Hawley also denied that it was obligated under the policy to provide a defense by stating that "Mt. Hawley does not hire defense counsel." In response to the D & O defendants' repeated requests that Mt. Hawley provide a defense subject to a reservation of rights, Mt. Hawley continued to refer to its letter of July 9. To date, Mt. Hawley has not reimbursed the D & O defendants for any costs of defense, nor has it paid any bills for attorneys' fees submitted to it.

On July 28, 1986, the D & O defendants tendered their defense to RLI by means of a letter to RTC Underwriting Services, Inc. as provided in the policy. *See* Memo in Support of D & O defendants' April 9 mo-

tion, Exhibit 5. The letter was answered on August 13, 1986, once again by Schaffer, counsel for Mt. Hawley, who expressed puzzlement at the reference to the RLI policy, since the previous correspondence had "all made reference to the Mt. Hawley policy." *Id.*, Exhibit 6. Schaffer explained that the RLI policy had a policy period of May 11, 1985 to May 11, 1986, and that "no claims were made on that policy during its policy period." The letter states, "We trust that this will have responded to your letter's [request for confirmation of the accuracy of defendants' coverage information]." *Id.* Schaffer then referred to his July 9 letter denying coverage under the Mt. Hawley policy.

In a letter dated June 2, 1986, FSLIC also notified Mt. Hawley on behalf of CSB that CSB had potential claims under the corporate reimbursement policy arising out of FSLIC's suit against Ferrante, et al., *see* Plaintiff's Reply to Opposition to Interpleader Motion, Exhibit 1.

Mt. Hawley has filed a complaint under 28 U.S.C. § 1335 and California Civil Procedure Code § 386, allowing the holder of a limited "stake" to interplead all claimants to the stake and force them to sort out their claims. Mt. Hawley's stake is the $500,000 limit of its liability under the insurance policy. Mt. Hawley has named as defendants in this suit CSB, FSLIC as receiver for CSB, and the D & O defendants. In its complaint, Mt. Hawley seeks (1) an order requiring all defendants to interplead their claims against the policy, (2) an order requiring all persons with claims against the directors and officers of CSB to bring their claims in this action, (3) a preliminary injunction preventing the institution or prosecution of any action against Mt. Hawley over the policy, (4) a preliminary injunction preventing the institution or prosecution of any suits against the officers and directors of CSB, (5) a final judgment decreeing that the policy is rescinded or that no defendants are entitled to recover under it and returning the proceeds to Mt. Hawley, (6) a final judgment discharging Mt. Hawley from any liability under the policy, and (7) attorneys' fees and costs. By this motion, Mt. Hawley seeks an order approving its interpleader proceeding, allowing Mt. Hawley to file a bond in lieu of depositing the entire proceeds of the policy in court, exonerating Mt. Hawley from any liability beyond the $500,000 stake, and directing all defendants to interplead their claims against the policy and against each other in this action.

The major D & O defendants have brought counterclaims against Mt. Hawley, RLI and another insurer,[1] alleging breach of insurance contract, unfair practices and breach of the covenant of good faith and fair dealing, and seeking declaratory relief. Their motions seek summary judgment on all of Mt. Hawley's claims and on the counterclaims against Mt. Hawley and RLI. Mt. Hawley and RLI have moved to dismiss the counterclaims against them. Taken together, these motions present all the issues of coverage under the two policies.

## III. DISCUSSION

### A. *Jurisdiction*

#### 1. The Interpleader Action

The interpleader statute, 28 U.S.C. § 1335, provides that the district courts have original jurisdiction over civil actions of interpleader brought by any corporation having issued a policy of insurance in the amount of $500.00 or more if two or more adverse claimants of diverse citizenship claim to be entitled to the money and plaintiff has deposited the money in court or has given bond in lieu of deposit. Diversity, as defined by 28 U.S.C. § 1332, must exist but only minimal diversity is required, that is, the citizenship of other claimants may be disregarded if any two claimants are diverse, *see State Farm Fire & Cas. Co. v. Tashire,* 386 U.S. 523, 530, 87 S.Ct. 1199, 1203, 18 L.Ed.2d 270 (1967).

1. The third insurer, Lumberman's Mutual Casualty Company ("Lumberman's"), issued a personal catastrophe liability insurance policy to Robert A. Ferrante covering the period August 7, 1985 through August 7, 1986. Lumberman's has filed an answer in this action, but is not involved in these motions.

In its complaint, Mt. Hawley alleges that the court has jurisdiction because "two or more of the defendants are citizens of different states," Complaint ¶ 2. As the FSLIC and other defendants point out, and as Mt. Hawley's reply papers acknowledge, this is not true. The defendants are not diverse because FSLIC is not a citizen of any state, *see Hancock Financial Corp. v. FSLIC,* 492 F.2d 1325, 1329 (9th Cir.1974), and the D & O defendants are all citizens of California. Mt. Hawley now contends that diversity exists among the claimants because Mt. Hawley itself claims the return of the fund to be deposited, and Mt. Hawley is incorporated in and has its principal offices in Illinois. This argument was accepted in *Lummis v. White,* 629 F.2d 397, 402–03 (5th Cir.1980), *rev'd on other grounds,* 457 U.S. 85, 102 S.Ct. 2325, 72 L.Ed.2d 694 (1982), where the citizenship of the plaintiff/stakeholder who was found to have an interest in the interpleaded fund, was considered in order to establish diversity under § 1335. This result in implied in *Treinies v. Sunshine Mining Co.,* 308 U.S. 66, 70–72, 60 S.Ct. 44, 47–48, 84 L.Ed. 85 (1939), where the Court held that the fact that a *disinterested* stakeholder was a co-citizen of one defendant did not make the federal court's exercise of its diversity jurisdiction under the Interpleader Act unconstitutional. The Court reasoned that it should examine the citizenship of the parties between whom there was a real controversy to determine whether the dispute was "between citizens of different states" as required by Article III, § 2. Since the plaintiff in *Treinies* had no interest in the stake, the controversy was between defendant/claimants of different states and the constitutional requirement, which was held to be of minimal diversity only, was satisfied. The Court thus implied that the citizenship of an *interested* stakeholder would *not* be irrelevant in determining whether diversity existed among adversaries. By extension, then, diversity could be established if an interested stakeholder and one or more of the defendant/claimants were diverse. *See* 14 Wright, Miller & Cooper, Federal Practice & Procedure § 3636, at 82 (2d ed. 1986).

Mt. Hawley also argues that this Court has diversity jurisdiction under 28 U.S.C. § 1332. This contention is incorrect because FSLIC is named as a defendant, but is not a citizen of any state. Since complete diversity is required under § 1332, *Strawbridge v. Curtiss,* 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806), the presence of FSLIC among the defendants destroys diversity, *Hancock,* 492 F.2d at 1329. And since there is no basis for federal jurisdiction other than § 1335, Mt. Hawley's arguments relying on Cal.Civ.Proc.Code § 386 are irrelevant. Indeed, these arguments are irrelevant in any event because interpleader is procedural, not substantive, and federal procedures apply in federal court, *see* 28 U.S.C. § 2072; Fed.R.Civ.P. 1. Nor can Mt. Hawley bring this action under Fed.R.Civ.P. 22, as an independent basis for jurisdiction is required for rule interpleader. This Court therefore has jurisdiction over Mt. Hawley's action only if it proceeds by way of statutory interpleader.

2. The Counterclaims

The FSLIC is not a party to the counterclaims of the D & O defendants. As the D & O defendants are all California citizens, while Mt. Hawley and RLI are citizens of Illinois, the Court has jurisdiction over the counterclaims under 28 U.S.C. § 1332, independent of its jurisdiction over the interpleader action.

B. *The Motion to Confirm Interpleader*

Mt. Hawley has attempted to make this case resemble *Tashire,* 386 U.S. 523, 87 S.Ct. 1199 in which the Supreme Court allowed the liability insurer of a truck driver to interplead its policy limits and require anyone having claims against the insured arising out of an accident bring the claims in the interpleader action. The insurer, too, was allowed to seek return of the fund on the ground that the accident was not covered by the policy. However, in *Tashire,* defense costs, the responsibility of the insurer, were not charged against the policy limits. Under the Mt. Hawley policy, by contrast, defense costs are charged against the policy limits.

The insurer in *Tashire* sought to be discharged from its obligation to provide the insured with a defense once it had deposited the policy limits in court, but this aspect of the case was not reached in the lower courts, and the Supreme Court did not rule on it. Other courts considering the question of whether an insurer could use interpleader to evade its duty to defend seem generally to have answered in the negative, *see, e.g., Millers' Mutual Ins. Assoc. of Ill. v. Iowa Nat'l Mut. Ins. Co.,* 618 F.Supp. 301, 303 (D.Colo.1985) (noting that court in prior interpleader action had discharged insurer from obligation to indemnify but not from duty to defend); *National Casualty Co. v. Insurance Co. of N. America,* 230 F.Supp. 617, 621–22 (N.D.Ohio 1964) (holding that interpleader would not be permitted to absolve insurer of its duty to defend). "Otherwise, where the damages exceed the policy coverage, the insurer could walk into court, toss the amount of the policy on the table, and blithely inform the insured that the rest was up to him," *National Cas. Co.,* 230 F.Supp. at 622 (quoting 8 Appleman, Insurance Law and Practice § 4685).

Mt. Hawley argues that its policy contains no duty to defend the insureds or to advance defense costs before the insureds' liability for covered claims is finally determined. Mt. Hawley supports this contention with several cases finding no duty to defend in similar policies, based on the fact that this kind of policy typically contains no duty to defend or to advance costs, and on the policy language.

Mt. Hawley's cases, however, do not support its position. In each case cited by Mt. Hawley, the policy in question contained a provision allowing the insurer *at its option* to take over the defense of claims against the insured. *See Gribaldo, Jacobs, Jones & Assoc. v. Agrippina Versicherunges A.G.,* 3 Cal.3d 434, 441, 91 Cal.Rptr. 6, 9, 476 P.2d 406, 409 (1970); *Enzweiler v. Fidelity & Dep. Co. of Md.,* Civil Action No. 85–99 (E.D.Ky. May 13, 1986) [available on WESTLAW, 1986 WL 20444], attached to Plaintiffs' Reply in Support of Motion to Dismiss as Exhibit 1; *Clandening v. MGIC Indem. Corp.,* CV 83–2432–LTL (C.D.Cal. May 23, 1983) (minute order dismissing complaint, to which Mt. Hawley has appended MGIC's Memorandum of Points & Authorities revealing that MGIC policy contains clause giving MGIC option to defend). In both *Gribaldo* and *Enzweiler,* the court relied heavily on this option clause in finding no duty to defend. The Mt. Hawley/RLI policy, however, contains no such clause.

Mt. Hawley would have the Court acknowledge that these policies "are generally indemnification policies," but it offers no evidence to support this contention. Moreover, the language of the policy does not establish that the Insurer's duty is to reimburse, rather than to advance costs. Under the applicable Ninth Circuit and California law, the RLI and Mt. Hawley policies are liability policies requiring the insurers to pay expenses on behalf of the insureds as they are incurred.

California law imposes on insurers a duty to defend unless a contrary intention appears in the insurance contract. *See* Cal. Civ.Code § 2778. The Mt. Hawley/RLI policies must, therefore, be read to provide a duty to defend unless such a duty is negated in language clear enough to meet the requirement of *Gray v. Zurich Ins. Co.,* 65 Cal.2d 263, 54 Cal.Rptr. 104, 419 P.2d 168 (1966), that "any exception to the performance of the underlying obligation must be so stated as clearly to apprise the insured of its effect." *Id.* at 269, 54 Cal. Rptr. at 107, 419 P.2d at 171. Nowhere in the policy language is this duty negated.

Analyzing the policy from its beginning, it is first of all designated a Directors and Officers *Liability* and Corporate Reimbursement Policy, *see* Declarations page of Mt. Hawley policy, Defendants' Counterclaims, Exhibit 2 (emphasis added). The insuring clause of the D & O policy states that, "[t]his policy shall, subject to its terms, conditions and limitations as hereinafter provided, *pay on behalf of* each and every person who was or now is or may hereafter be a Director or Officer (who are hereinafter individually or collectively sometimes called the "Insureds") against loss (as herein defined)," (emphasis added).

The plain meaning of "pay on behalf of" is to disburse to a third party money owed by the insured. The policy could have promised only to indemnify the insureds against loss, but it does not. The insuring clause, setting forth the fundamental obligation of the policy, establishes this as a liability policy. As such, it is subject to the requirement of Cal.Civ.Code § 2778(1), entitling the insured to recover upon becoming liable.

Clause 11(c) of the policy defines the term "loss" as "any amount which the Insureds are legally obligated to pay ... and shall include ... costs, charges and expenses ... incurred in the defense of civil actions." Once again, the language of the policy indicates an intention to insure against liability. *See, e.g., Okada v. MGIC Indemnity Corp.*, 823 F.2d 276, 280 (9th Cir.1987), *amending* 795 F.2d 1450 (1986). Mt. Hawley and RLI argue that this language provides that the insurer need pay no loss until the insureds' liability has been finally determined by disposition of the claim. To the contrary, the provisions quoted thus far state that the insurer will pay on behalf of the insured defense costs that the insureds are legally obligated to pay. While the insureds are not "legally obligated to pay" judgments against them until such judgments are entered, the same reasoning does not apply to the costs of defense. *See id.* Mt. Hawley's implied argument that clients are not "legally obligated" to pay their attorneys until the claims against them have been finally disposed of is not compelling.

Defendants also argue that Clause IV(d), which excludes claims arising out of dishonest acts by the Insureds, specifically providing that the insureds will be covered unless their dishonesty is established through adjudication, shows that payment of defense costs by the insured prior to judgment is anticipated in the policy. However, a more natural reading of this clause is that it provides coverage for claims of dishonesty that are settled or otherwise concluded without a judicial finding of such dishonesty. The clause has no bearing on the timing of payments.

Section VI of the policy covering "Costs, Charges and Expenses and Defense" provides that no costs, charges or expense shall be incurred without the Insurer's consent which shall not be unreasonably withheld. If consent is given, the Insurer will pay 95% of all costs, charges and expenses,

> subject nevertheless to the following conditions.
>
> (i) If a payment not in excess of the Limit of Liability has to be made to dispose of a claim, costs, charges and expenses shall be payable up to the Limit of Liability applicable under this policy.
>
> (ii) if the claim is successfully resisted by the Insureds, costs, charges and expenses shall be payable up to but not exceeding the Limit of Liability under this policy.

These conditions are clearly intended to establish the effect of the limit of liability on the amount to be paid under various circumstances. Mt. Hawley's attempt to characterize this language as setting forth conditions precedent to payment flies in the face of the plain language of the policy.

Finally, Part VII, "Loss Provisions" provides that "[t]he time when a loss shall be incurred within the meaning of this policy shall be the date on which the Insurer receives written notice from the Insureds...." This provision seems to contradict Mt. Hawley's contention that no loss is incurred until the claims against the insureds have been disposed of. The following clause states that "[t]he Insureds shall, as a condition precedent to their right to be reimbursed under this policy give to the Insurer notice as soon as practicable in writing...." This is the first clear indication that reimbursement, rather than advancement of costs, might be contemplated by the policy. Taken together with the other provisions in the policy, however, it only serves to render the policy ambiguous.

The Court, in interpreting the RLI/Mt. Hawley policy language, is aware that, as the insurers contend, these policies are widely regarded as indemnity policies with no duty to defend, *see, e.g.*, Note, *Practical Aspects of Directors' and Officers' Liabil-*

*ity Insurance—Allocating and Advancing Legal Fees and the Duty to Defend,* 32 U.C.L.A.L.Rev. 690, 691 (1985) (hereinafter "Practical Aspects"). However, the Court also notes that insurers under policies similar to the ones at hand often advance defense costs when they believe claims are likely to be covered, *see, e.g., Okada,* 823 F.2d at 279; *Practical Aspects* at 711. The Court cannot, therefore, accept unsupported assurances about what *these* insureds believed about their policy. Rather, the Court has concluded that it is constrained to follow the *Okada* court and find that the policy at issue was a liability policy obligating the insurer to advance defense costs as they were incurred. Indeed, this policy is a stronger candidate for such a finding than the policy in *Okada:* the Mt. Hawley policy lacks the clause giving the insurer the option to assume the defense of actions against the insured and, in this case, it is subject to the operation of Cal. Civ.Code § 2778 imposing on the insurer a duty to defend.

Even if the policy did not contain a duty to advance defense costs, it is clear that Mt. Hawley's responsibilities under the policy go beyond the mere payment of money for covered losses. For example, the policy provides in part VI(a), that "[n]o costs, charges or expenses shall be incurred without the Insurer's consent which shall not be unreasonably withheld." The policy further provides,

> (b) The Insureds shall not be required to contest any legal proceedings unless counsel (to be mutually agreed upon by the Insureds and the Insurer) shall advise that such claim should be contested by the Insureds and the Insurer's consent thereto, shall not be unreasonably withheld. In the event of the Insureds' being so required to contest legal proceedings, the Insurer subject to the provisions of Clause V(c) [governing the retention amount] will pay 95% of all costs, charges and expenses in connection therewith.

Mt. Hawley is thus required by the terms of its own policy to give or reasonably withhold its consent to defense costs and to participate in the decision whether to contest suits against the insureds. It would be inequitable to absolve Mt. Hawley of these responsibilities, but unworkable to permit Mt. Hawley to exercise its discretion over the expenditure of the policy proceeds once they had been deposited in court. The appointment of a special master, as proposed by Mt. Hawley in its reply papers, does not address this fundamentally unsolvable problem.

Mt. Hawley argues that the very insolubility of the problem weighs in favor of interpleader. However, Mt. Hawley's problem is of its own making. Mt. Hawley issued the policy to cover a group of directors and officers in the event claims were made against them. The policy bristles with provisions governing which claims will and will not be covered, in what amounts, and under what circumstances. Claims have now been made against this group, as anticipated, but instead of attempting to implement the policy provisions, Mt. Hawley has brought this action. "We are not impressed with the notion that whenever a minor problem arises in the payment of insurance policies, insurers may, as a matter of course, transfer a part of their ordinary cost of doing business to their insureds by bringing an action for interpleader," *Travelers Indemnity Co. v. Israel,* 354 F.2d 488, 490 (2d Cir.1965) (Friendly, J.). Mt. Hawley may face more than "a minor problem," but it cannot be permitted to designate its own insureds as adverse claimants to the policy in order to avoid making the investigations and decisions required of it by the policy.

### C. *Defendants' Motions for Summary Judgment and Insurers' Motion to Dismiss*

The counterclaiming D & O defendants seek summary judgment on their interpretation of the Mt. Hawley and RLI policies, on their claims that the insurers have acted in bad faith and in violation of the California Insurance Code, and on all issues raised by Mt. Hawley's complaint. Mt. Hawley and RLI oppose this motion arguing *inter alia* that the Mt. Hawley policy should be rescinded because the application therefor

contained material misrepresentations, and that no claim was properly made against the RLI policy, and move to dismiss the counterclaims on the ground that claims arising from the FSLIC suit are clearly excluded from coverage under either policy.

1. Rescission of the Mt. Hawley Policy

Mt. Hawley alleges that it is entitled to rescind the policy issued to CSB because the application for the policy contained material misrepresentations. Specifically, Mt. Hawley claims that CSB should have revealed that it had received a highly critical FHLBB and California Department of Savings and Loan ("CDSL") Report of Examination in June 1985, as well as various Letters Directive from the FHLBB throughout the latter half of 1985 and early 1986.

Defendants do not attempt to argue that this information would not be material to Mt. Hawley's decision whether to issue the policy. Instead, they argue, first, that Mt. Hawley has not properly rescinded the policy and is now estopped from doing so and, second, that CSB fully disclosed the information in question to Financial Guaranty Broker ("Financial") which, defendants contend, acted as Mt. Hawley's agent in making this contract of insurance.

a. *Is Mt. Hawley's Attempt to Rescind Proper?*

■ Defendants argue that Mt. Hawley cannot now rescind the policy because it did not give the insureds timely notice of its intent to do so as required by California law. California Civil Code § 1689 allows a contract to be rescinded by a party where the party's consent thereto was obtained through fraud or mistake. To rescind a contract, the party must, promptly upon learning the facts entitling it to rescind, notify the other parties of the intent to rescind and return or offer to return everything of value received under the contract. *See id.* at § 1691. The California Insurance Code further provides that an insurer may rescind a contract of insurance if the insured conceals material information, Cal. Ins.Code § 331, or makes material misrepresentations, *see id.* at § 359. Section 650 of the Insurance Code requires that an insurer exercise any right it has to rescind a contract of insurance "previous to the commencement of an action on the contract." Taken together, Civil Code § 1691 and Insurance Code § 650 have been held to permit an insurer to rescind a contract of insurance at any time within the period permitted by Civil Code § 1691 provided no action has yet been brought on the contract. *See Cole v. Calaway,* 140 Cal. App.2d 340, 295 P.2d 84 (1956).

Defendants' position is that Mt. Hawley was required to exercise any right it might have had to rescind the policy before bringing its interpleader action. Mt. Hawley replies that such a rule would be ridiculous, and that Insurance Code § 650 does not bar it from bringing a declaratory relief action seeking a judicial determination of its right to rescind. Mt. Hawley cites *Glens Falls Ins. Co. v. Satree,* 320 F.2d 92 (9th Cir.1963), as an example of a case, decided under California law, where such an action was allowed. *Glens Falls* involved an appeal from a declaratory judgment action seeking rescission, in which there was no indication that the insurer attempted to rescind before bringing the action. However, *Glens Falls* did not address this issue at all. The failure of the *Glens Falls* court to mention any pre-litigation rescission or to deal with the effect of § 650 cannot be interpreted as a definitive statement of the law on this point. Moreover, Mt. Hawley did not bring a declaratory judgment action, it brought an action in the nature of interpleader, in which it sought the assistance of this Court in actually fulfilling its obligations under the insurance contract. Without question, this is "an action on the contract." Insurance Code § 650 clearly required Mt. Hawley to rescind the policy *before* filing its complaint. Mt. Hawley failed to rescind within the time allotted by § 650 and is now foreclosed from doing so.

b. *Did CSB Conceal or Misrepresent Material Information?*

■ Defendants claim that they did, in fact, reveal all of their 1985–86 dealings with the regulatory authorities to both RLI

and Mt. Hawley. In his declaration, attached to Defendants' Opposition to Mt. Hawley and RLI's motion, Robert C. Hamilton describes the process by which the Mt. Hawley policy was obtained. In February 1986, CSB was informed by Financial Guaranty Service ("Financial"), CSB's insurance broker, that the RLI policy would not be renewed and that Financial would seek coverage elsewhere. In April, Financial said that Mt. Hawley would insure CSB's directors and officers. Financial forwarded to CSB a "Renewal Application" which Hamilton, as Vice President and Chief Financial Officer of CSB, completed. This application asked no questions that might call for revelation of the information at issue. However, Financial asked CSB for information about any regulatory activity, which was to be forwarded to Mt. Hawley. Hamilton claims that he compiled all relevant documentation, including the Bank Examiner's Report and Letters Directive, and sent it to Financial, presumably with the renewal application, which was dated May 5, 1986.

Mt. Hawley in its papers claims that it never received this information from CSB and knew nothing about any regulatory activity until June 6, 1986, when the D & O defendants tendered their defense of *FSLIC v. Ferrante* to Mt. Hawley. Mt. Hawley contends that its supporting declarations show that none of the entities that dealt with CSB's application "ever received this information in connection with either the RLI or the Mt. Hawley policies." Reply of Mt. Hawley and RLI at 3. This characterization of Mt. Hawley's evidence is incorrect, however. Gary Bonham, Vice President/Claims for both RLI and Mt. Hawley, states in his declaration that "neither RLI nor Mt. Hawley ever received from Robert C. Hamilton or anyone in connection with either the Mt. Hawley or RLI policies or otherwise, any of the following documents *before* May 11, 1986," (emphasis added). Don Fischer, President of Fischer Underwriting Corporation ("Fischer"), agent for Mt. Hawley and RLI, states in his declaration that Fischer "never" received the documents. Likewise, Lana Miller, Vice President of Steward Smith West, Inc., the wholesale insurance broker for the Mt. Hawley and RLI policies, states that Stewart Smith West "never" received the documents. Judith Lipschutz, Executive Vice President of Financial, however, states that "Financial never received ... any of the following documents *before May 11, 1986,*" (emphasis added). There is thus no evidence to contradict Hamilton's account. He forwarded the documents to Financial with CSB's application and Financial passed them on to Mt. Hawley/RLI where they arrived on or about May 11, 1986. CSB, therefore, did not conceal its troubles with the FHLBB and the CDSL when it applied to renew the RLI policy.

■ Even if Mt. Hawley did not receive the Bank Examiner's Report and Letters Directive, it may be that receipt of these documents by Financial was sufficient to notify RLI and Mt. Hawley. Ordinarily, as Mt. Hawley and RLI point out, an insurance broker is the agent of the insured and not of the insurer. Hamilton's declaration reveals that he expected Financial to shop around for "another company" for CSB's insurance, indicating a likelihood that Financial was acting as CSB's agent and not RLI or Mt. Hawley's. However, defendants provide evidence that Financial had the power to bind Mt. Hawley, indicating that Financial was Mt. Hawley's agent. *See Marsh & McLennan, Inc. v. Los Angeles,* 62 Cal.App.3d 108, 113, 132 Cal.Rptr. 796, 800 (1976). Judith Lipschutz of Financial signed the binder issued to CSB in renewal of the RLI policy, *see* Defendants' Exhibit 4; this binder is referred to by Lipschutz as "our Binder" in the accompanying correspondence, *see id.*

In short, it appears that CSB did notify Mt. Hawley of its dealings with the regulatory agencies in making its application for renewal insurance coverage. Even if it had concealed this information, however, Mt. Hawley is now foreclosed from attempting to rescind its policy.

2. The Presentation of Claims to RLI

The RLI policy is a "claims made" policy covering "claims which are first made against the insured and reported to the

Insurer during the policy period," RLI policy, Defendants' Counterclaim, Exhibit 1, "Insuring Clause." RLI contends that no claims were made against the policy during the policy period and so it is not liable to counterclaimants under the terms of the policy. While RLI is not clear on this point, this contention logically has two parts: no claims were made against the insureds during the policy period and/or no claims were reported to RLI during that time. Defendants argue that claims were made on them and that they did notify RLI of these claims during the policy period, that even if they did not, they notified RLI of the claims during the 90-day discovery period to which they were entitled and for which they would have paid if RLI had not breached its duty to inform them of its availability, that RLI has failed to show any prejudice arising from the insureds' failure to notify it of claims during the policy period, and that in any event RLI has not complied with the California statutory requirements for a claims-made policy.

a. *Were Claims Made Against the Insureds During the Policy Period?*

Defendants argue that, although the FSLIC suit was not filed until May 23, 1986, after the expiration of the RLI policy period, the underlying "claims" against the D & O defendants were made earlier, when CSB became the target of corrective action by bank regulators, *cf. Phoenix Ins. Co. v. Sukut Constr. Co.*, 136 Cal.App.3d 673, 186 Cal.Rptr. 513 (1982) (holding that "claim" was made against insured lawyer when client asked him to work without pay to correct acknowledged error, despite fact that suit was not filed for eight months thereafter).

The RLI policy insures the D & O defendants against "loss" arising from "any claim or claims which are first made against the insured and reported to the Insurer during the policy period...." "Loss" is defined as "any amount which the Insureds are legally obligated to pay for a claim or claims made against them ...," but "claim" is not defined, nor does the policy indicate what constitutes the making of a claim against the Insureds. As there is no definition of "claim" in the policy, the Court turns to California law to determine whether claims were made on the Insureds before the end of the RLI policy period. California courts have held that the word claim " 'imports the assertion, demand or challenge of something as a right; the assertion of liability to the party making it to do some service or pay a sum of money.... [citation]

[¶] A "claim" refers to a debt due the claimant.' " *Williamson Vollmer Engineering v. Sequoia Ins. Co.*, 64 Cal.App.3d 261, 269, 134 Cal.Rptr. 427, 431 (1976) (quoting *San Pedro Properties, Inc. v. Sayre & Toso, Inc.*, 203 Cal.App.2d 750, 755, 21 Cal.Rptr. 844, 847 (1962)), disapproved on other grounds in *Gyler v. Mission Ins. Co.*, 10 Cal.3d 216, 110 Cal.Rptr. 139, 514 P.2d 1219 (1973). A "claim" is not a request for an explanation, *see Hoyt v. St. Paul Fire & Marine Ins. Co.*, 607 F.2d 864 (9th Cir.1979) (applying Arizona law and holding that letter to attorney questioning his work on a will did not constitute a "claim" during policy period for purposes of malpractice coverage).

On or about September 20, 1985 and November 20, 1985, the FHLBB sent CSB letters directing CSB's Board of Directors to comply with various operating restrictions resulting from CSB's violations of the regulations and conditions of its federal insurance. These letters warned that failure to comply with the FHLBB's directives could result in "formal enforcement proceedings." On February 28, 1986, the FHLBB sent a further letter directive imposing severe operating restrictions on CSB "for the protection of the Federal Savings and Loan Insurance Corporation, the insured institution, and the insured depositors." The letter also expressed the dismay of the bank regulators at the CSB Board of Directors' apparent failure to appreciate the seriousness of the agency's concerns, and asked the directors to address the issues raised "in light of your fiduciary duties with respect to the safety and soundness of Consolidated Savings Bank."

These letters, and particularly the February Letter Directive, assert on behalf of CSB and the FSLIC a demand that the directors of CSB perform duties owed to the bank. The February 1986 letter, at least, thus constituted a claim made against the officers and directors of CSB during the period of the RLI policy.

b. *When Were Claims Reported to RLI?*

As noted above, the RLI policy covered claims made against the insureds *and reported to the Insurer* during the policy period. Moreover, the policy also provides that notice of claims be made as soon as practicable. Defendants contend that RLI was notified of the claims made by the regulatory agencies when Hamilton sent the Bank Examiners' Report and Letters Directive to Financial to be forwarded to Mt. Hawley. There is no evidence, however, to controvert Mt. Hawley's, RLI's and Financial's claims that they did not receive this information before May 11, 1986. Hamilton does not say when he sent these documents to Financial. The RLI policy expired at 12:01 a.m. on May 11, 1986. In addition, the policy requires notification of claims or potential claims to be made to RTC Underwriting Service, Inc. ("RTC"), not to Financial. Notice of these claims was not given through RTC until July 28, 1986.

It thus appears that defendants did not properly notify RLI of the claims made against them until July 28, 1986, a full five months after the last Letter Directive and more than two months after the policy had expired. However, under California law, the mere violation of a notice provision in an insurance policy, even a "claims made and reported" policy as this one purports to be, does not relieve the insurer of its obligations under the policy unless the insurer can show that it was substantially prejudiced by the violation. The burden is on the insurance company to demonstrate the prejudice resulting from the lack of prompt notice, *see Campbell v. Allstate Ins. Co.,* 60 Cal.2d 303, 307, 32 Cal.Rptr. 827, 829, 384 P.2d 155, 157 (1963). RLI has made no effort to make such a showing, except to argue that the insurer must be able to "close the books" on a claims-made policy at some point. Uncertainty about when the books can be closed is inherent in the "substantial prejudice" rule; the Court cannot presume prejudice from the mere operation of the rule. Nor is it obvious from the facts of this case that RLI has been prejudiced by lack of prompt notice. As noted above, Mt. Hawley and RLI are related companies and shared the same Vice President/Claims, Gary Bonham, in May 1986. Bonham probably received the CSB Bank Examiners' Report and Letters Directive on May 11, 1986. He was certainly aware of the *FSLIC v. Ferrante* suit by June 6, when the D & O defendants tendered their defense to Mt. Hawley. While the Court does not infer from these facts that a showing of prejudice to RLI cannot be made, such a showing could be necessary to relieve RLI of its duties under its policy.

3. Were Defendants Entitled to a Discovery Period?

The RLI policy provided that, if RLI cancelled or refused to renew the policy, the Insureds could, by paying an additional premium, extend the policy period by ninety days to cover claims arising out of acts committed before the cancellation. *See* RLI policy VIII(a). Defendants did not apply for such an extension, but they contend that RLI breached an obligation to notify them of the availability of this extension.

Mt. Hawley and RLI argue that the discovery clause does not apply to this situation because the Mt. Hawley policy was a renewal of the RLI policy by a subsidiary company. However, the availability of the discovery period is not conditioned on the insureds' inability to obtain coverage with a related company. Moreover, the RLI policy limits were twice those of the Mt. Hawley policy so that an extension of the RLI policy might be desired even though coverage continued under another policy. RLI refused to renew its coverage; the discovery clause by its plain terms applied.

However, defendants should have known that the policy contained a discovery

clause. They do not contend that the clause was unclear or ambiguous, nor could they. "[I]t is a duty of the insured to read his policy," *Aetna Cas. & Sur. Co. v. Richmond,* 76 Cal.App.3d 645, 143 Cal.Rptr. 75, 79 (1977) (quoting *Taff v. Atlas Assur. Co.,* 58 Cal.App.2d 696, 703, 137 P.2d 483 (1943)). Had Hamilton or anyone at CSB read the policy, he could not have failed to understand the discovery clause; RLI had no obligation to bring the clause to CSB's attention. The fact that Stewart Smith West notified Financial of the existence of the clause, *see* Defendants' Exhibit 5, simply has no bearing on this point. Nor is the fact that Fischer notified the FHLBB of the discovery clause in the Mt. Hawley policy relevant.

4. Is the RLI Policy Defective Under California Law?

Defendants argue that the RLI policy fails to comply with Cal.Ins.Code § 11580.01, which requires a claims-made policy to bear on its face a conspicuous legend "substantially to the following effect":

NOTICE

Except to such extent as may otherwise be provided herein, the coverage of this policy is limited generally to liability for only those claims that are first made against the insured while the policy is in force. Please review the policy carefully and discuss the coverage thereunder with your insurance agent or broker.

The RLI policy bears a stamp on its first page (not counting the declarations and endorsements) reading "THIS IS A CLAIMS MADE POLICY. PLEASE READ CAREFULLY." Also on that page as the first item of the policy, is the insuring clause, providing coverage for "claims which are first made against the insured and reported to the Insurer during the policy period." Each of these items appears on both the Directors and Officers Liability and the Corporate Reimbursement portions of the policy. Together they constitute substantial compliance with § 11580.01. In addition, the full statutory notice quoted above appeared prominently on the original proposal for insurance signed by Robert A. Ferrante on May 1, 1984, *see* Substitute Exhibit 2 to Complaint.

5. Are the Claims Covered Under the Mt. Hawley/RLI Policy

Because the Court finds that claims were made on the insureds during the RLI policy period, and were properly presented to Mt. Hawley while its policy was in effect, and that RLI has failed to show prejudice from the lack of timely notice of the claims made, it is necessary to determine whether claims arising from *FSLIC v. Ferrante* are covered under either policy.

Endorsement # 3 to the RLI and Mt. Hawley policies states that,

> the insurer shall not be liable to make any payment in connection with any claim or suit, including but not limited to shareholders' derivative suits and/or representative class action suits, brought by one or more past, present or future Directors and/or Officers including their estates, beneficiaries, heirs, legal representatives, assigns and/or the company named in Item 1 of the Declarations against one or more past, present or future Directors or Officers.

In the binder issued at the inception of the Mt. Hawley policy, this endorsement is referred to as the "insured v. insured" exclusion.

Mt. Hawley and RLI argue that this provision clearly excludes coverage of *FSLIC v. Ferrante* because FSLIC brought that suit as receiver for CSB, the "company named in Item 1." Their position is that *FSLIC v. Ferrante* is thus a suit brought by CSB against its directors and officers which falls squarely within the exclusion. The Court finds this reading of the exclusion to be both natural and reasonable. FSLIC, in its suit, has asserted claims belonging to CSB. These claims would not be covered under the policy if asserted by CSB; it is difficult to argue that they should be covered when asserted on behalf of CSB by its receiver.

Defendants contend that the exclusion is "ambiguous at best" because it does not

specifically state that suits brought by FSLIC are excluded. Defendants point out that, at the time the Mt. Hawley and RLI policies were issued, Mt. Hawley had in use an endorsement that specifically excluded coverage for claims "brought against the Insured(s) by or on behalf of any governmental or quasi-governmental body empowered with regulatory control or authority over [CSB]" ("the regulatory endorsement"). Defendants' Supplemental Memorandum (June 10, 1987), Exhibit 1. The policies at issue, however, do not contain this endorsement. Defendants argue that the omission of this exclusion from these policies indicates an intent to provide coverage for claims brought by regulatory agencies such as the FSLIC.

To fully understand the effect of the failure of the contracting parties to include the regulatory endorsement in these policies, the dual capacity of the FSLIC as both receiver and creditor of a failed institution requires consideration. This dual capacity is inherent in the statutory and regulatory scheme creating and governing the FSLIC and has often been discussed in the cases. *See Womble v. Dixon*, 752 F.2d 80, 81 (4th Cir.1984); *cf. Landy v. FDIC*, 486 F.2d 139, 149 (3d Cir.1973). In many instances, when the FSLIC is appointed as receiver for an insolvent institution, it acts in its capacity as a receiver only long enough to execute a "Purchase and Assumption" transaction, 12 U.S.C. § 1729(f)(2), under the terms of which the insolvent institution's saleable assets and liabilities are sold to a solvent insured institution, while its less desirable assets are assumed by the FSLIC in its corporate capacity. *See, e.g., FSLIC v. Alexander*, 590 F.Supp. 834, 839 (D.Ha.1984) (noting that FSLIC as receiver managed failed bank for only four hours). When the FSLIC later sues the officers and directors in that situation, it does so on its own behalf in its corporate capacity. Accordingly, if the regulatory endorsement had been a part of the policy, it would quite clearly have barred coverage of *FSLIC v. Ferrante* as an assertion of claims *by,* if not *on behalf of,* the FSLIC. It also would have defeated coverage of suits brought by the FSLIC in its corporate capacity as the assignee or subrogated insurer of the depositors, creditors or shareholders of CSB. *Cf. Okada*, 823 F.2d at 279 (noting that FSLIC in underlying suit sued as assignee of shareholders' claims).

However, in this case, CSB's assets have not been sold to another bank; the FSLIC remains in its capacity as receiver for the purpose of liquidating CSB. As receiver for CSB, FSLIC has full power to carry on the business of the bank, 12 U.S.C. § 1729(d), and has succeeded to the "rights, titles, powers and privileges" of the bank as well as to the "rights, powers, and privileges of its members, officers, and directors," 12 C.F.R. § 547.7. In bringing *FSLIC v. Ferrante,* FSLIC "stands in the shoes" of CSB. CSB is only able to bring an action through its receiver; its officers and directors can no longer sue on its behalf, *see First S. & L. Assoc. v. First Fed. S. & L. Assoc.*, 531 F.Supp. 251, 255–56 (D.Ha.1981). Nor can shareholders of a bank in receivership sue on behalf of the bank without first demanding that the receiver bring suit, *see Womble*, 752 F.2d at 82; Fed.R.Civ.P. 23.1. The receiver even acquires such "personal" rights as the corporation's attorney-client privilege, *see Odmark v. Westside Bancorporation, Inc.*, 636 F.Supp. 552, 554 (W.D.Wa.1986); *cf. Citibank N.A. v. Andros*, 666 F.2d 1192 (8th Cir.1981). " 'The receiver ... becomes to all intents and purposes the bank—at least he stands in the place of the bank," *Landy v. FDIC*, 486 F.2d 139, 147 (3d Cir. 1973) (quoting *O'Connor v. Rhodes*, 79 F.2d 146, 148 (D.C.Cir.1935)).[2] In sum, the

2. Defendants argue that the FSLIC as receiver represents the interests not only of CSB, but also of the bank's creditors and depositors, *see, e.g., Professional Asset Management, Inc. v. Penn Square Bank, N.A.*, 566 F.Supp. 134, 136–37 (W.D.Okla.1983) (holding that punitive damages could not be awarded against receiver because to do so would injure innocent creditors and depositors of culprit bank); *see also FDIC v. National Union Fire Ins. Co.*, 630 F.Supp. 1149, 1156 n. 4 (W.D.La.1986) (noting that FDIC "does not simply stand in the shoes of its predecessor bank"). While the receiver represents all parties interested in the *bank's* assets, it does not thereby acquire all causes of action these other parties individually may have against the offi-

*presence* of the regulatory exclusion would have lead to the conclusion that there was no coverage for *any suit* brought by the FSLIC in *any capacity.* The question then is whether the *absence* of the regulatory endorsement must lead to the conclusion that there is coverage for this suit which is sought by the FSLIC in its capacity as a receiver. The answer is that even though the regulatory endorsement was omitted, Endorsement 3's exclusion of coverage for suits by CSB also operates to exclude coverage for this suit brought by the FSLIC as receiver for CSB.

Defendants argue that Endorsement 3 is ambiguous because, while it specifically excludes coverage of claims made by the "estates, beneficiaries, heirs, legal representatives, [or] assigns" of the officers and directors, it does not expressly extend the exclusion to coverage of claims by the "estates, beneficiaries, heirs, legal representatives, [or] assigns" of the company itself. While it is undeniable that the endorsement omits these particular words, their omission hardly seems to create an ambiguity. Obviously, corporations do not have estates, beneficiaries or heirs, so the inclusion of that language would have been meaningless. Also, there is no issue as to assigns in this case, leaving only the question of whether the omission from the exclusion of the words "legal representatives" has any significance in this case. It does not appear that it does. First, the *inclusion* of the words "or its legal representatives" after the word "company" would have created a redundancy since corporations only act through legal representatives in any event. Second, and more importantly, it would be completely unreasonable to read Endorsement 3 as excluding coverage for suits brought against the officers and directors by the company but not for suits brought against them by the receiver in the name of the company. To reach this result solely because the words "or its legal representatives" were omitted from the exclusion would require an unduly strained interpretation which this Court cannot accept.

Any ambiguity in an insurance policy will be resolved against the insurer, *Gray v. Zurich Ins. Co.,* 65 Cal.2d 263, 54 Cal.Rptr. 104, 419 P.2d 168 (1966). To be ambiguous, however, language must be reasonably susceptible of more than one interpretation, giving the words used their ordinary, plain meaning. "Courts will not adopt a strained or absurd interpretation in order to create an ambiguity where none exists," *Reserve Ins. Co. v. Pisciotta,* 30 Cal.3d 800, 807, 180 Cal.Rptr. 628, 631–32, 640 P.2d 764, 767–68 (1982); Cal.Civ.Code § 1638. The Court therefore holds that Endorsement 3 in both the RLI and Mt. Hawley policies unambiguously excludes coverage for *FSLIC v. Ferrante. Cf. American Cas. Co. v. FDIC,* 677 F.Supp. 600 (N.D.Iowa, 1987) unpublished opinion attached as Exhibit 3 to Mt. Hawley's and RLI's Reply of May 19, 1987.[3]

Finally, even if Endorsement 3 were held to be ambiguous, the Court would find no coverage for *FSLIC v. Ferrante.* The purpose of the rule that ambiguities in insurance contracts are to be resolved against

cers and directors of the failed bank. The FSLIC has chosen not to assert its own claims against the directors and officers acquired as subrogee of the insured depositors; the only claims remaining to it are those of CSB itself.

3. A contrary result was reached in *FDIC v. National Union Fire Ins. Co.,* 630 F.Supp. 1149 (W.D.La.1986). In that case, the court relied on the rule, codified at 12 U.S.C. § 1823, that secret side agreements between a debtor and a failed bank could not be asserted against the FDIC after it had acquired the bank's assets, *see D'Oench, Duhme & Co. v. FDIC,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942). The court reasoned that the policy underlying this rule, that the FDIC must be able to quickly evaluate a failed bank's assets so as to facilitate purchase and assumption transactions, also barred the assertion by the bank's D & O insurer of any defense to coverage not clearly applicable to the FDIC, *see id.* at 1156. *FDIC v. NUFIC* is distinguishable from this case, however. Here, the FSLIC is suing not as an assignee of the bank's claims, but as receiver for the bank; the *FDIC v. NUFIC* court found that the FDIC there sued to recoup its own losses caused by the actions of the officers and directors. The Court rejects the finding of the *FDIC v. NUFIC* court that the insured v. insured exclusion, at least as applied to the facts of the instant case, constitutes a "secret side agreement" that cannot be asserted against the FSLIC.

the insurer is "to protect the insured's reasonable expectation of coverage in a situation in which the insurer-draftsman controls the language of the policy," *Reserve Ins. Co.*, 30 Cal.3d at 808, 180 Cal.Rptr. at 632, 640 P.2d 768. D & O insurance is designed to protect directors and officers, and the corporation which must indemnify them, from losses arising out of claims made by those perceived as "outsiders"—shareholders, customers, other third parties, even employees of the corporation. As the numbers of such suits have increased, potential officers and directors of corporations have come to expect, and even demand, insurance to protect them from the costs of defending against claims commonly arising from the performance of their duties before they will accept such exposed positions with the corporation. *See Practical Aspects* at 690; Bishop, *Sitting Ducks and Decoy Ducks: New Trends in the Indemnification of Corporate Directors and Officers*, 77 Yale L.J. 1078, 1078 (1968) (describing insurance advertisement warning corporate directors that they may be "sitting duck[s] for a shareholder or third party liability suit"). D & O insurance is thus meant to protect the insureds against the hazards posed by "unruly stockholders" and the uncertainties created by "fertile legal imaginations" conceiving "novel and alarming theories of liability." Bishop, *New Problems in Indemnifying and Insuring Directors: Protection Against Liability under the Federal Securities Laws*, 1972 Duke L.J. 1153, 1153. It is not meant to protect the insureds from claims made against them by the corporation itself. It is difficult to argue that it is within the reasonable expectations of the parties to such an insurance contract that the corporation was paying D & O insurance premiums to protect the directors and officers from the consequences of breaching their duty to the corporation. If coverage for claims made by the corporation against the officers and directors does not fall within the scope of the "insured's reasonable expectation of coverage," there is no reason for the insureds to suppose that these same claims would be covered if brought by the receiver for the corporation. Interpreting Endorsement 3 to exclude claims brought by CSB acting through its receiver does not, therefore, "remove from the policy a risk against which ... the insured *intended* to protect himself," *Meyer v. Pacific Employers Ins. Co.*, 233 Cal.App.2d 321, 327–28, 43 Cal.Rptr. 542, 547 (1965), *quoted in Gray v. Zurich Ins. Co.*, 65 Cal.2d 263, 274, 54 Cal.Rptr. 104, 111, 419 P.2d 168, 174 n. 13 (1966) (adding emphasis).

Although the parties have offered no evidence on the circumstances under which these policies were written, the Court notes that Endorsement 3 appears to have been tailored to the needs of these particular insureds. Endorsement 3 clearly excludes from coverage shareholders' derivative suits. This is a strange exclusion to find in a D & O policy; ordinarily, shareholders' suits are the *primary* source of covered claims against directors and officers, *see* The Wyatt Company, 1982 Comprehensive Report: Directors & Officers Liability/Fiduciary Liability 17–18 (1982) (hereinafter "1982 Report"), *cited in Practical Aspects* at 693. However, defendant Ferrante is CSB's only shareholder; under CSB's particular circumstances, it was clearly reasonable not to pay for coverage of derivative suits. It therefore appears that Endorsement 3 received attention from the insureds in the purchase of the policy; it did not lurk undiscovered in the fine print.

Finally, reading Endorsement 3 to exclude coverage of *FSLIC v. Ferrante* does not eviscerate the policy. Although there is no evidence before the Court on whether any other claims were ever made under either the RLI or Mt. Hawley policies, the Court notes that the policies afforded the insureds substantial coverage of other types of claims. The directors and officers were insured against claims made by employees and by customers, the second and third largest groups of plaintiffs in suits against corporate officials, *see* 1982 Report at 17–18. As noted above, the policies did not include the regulatory endorsement; thus, it appears that suits brought by governmental agencies *not* suing on behalf of CSB would have been covered. Govern-

ment was the fourth largest source of claims against corporate officials in the Wyatt Company's 1982 Report, *see id.* The coverage actually provided by the RLI and Mt. Hawley policies, therefore, was neither illusory nor contrary to the reasonable expectations of the insureds. Since, under the plain terms of the policy, there could be no coverage for any claims made against the D & O defendants by CSB through the FSLIC as its receiver, Mt. Hawley and RLI have no duty to defend the D & O defendants, to indemnify them or to pay losses on their behalf arising out of the *FSLIC v. Ferrante* lawsuit.